IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 27, 2022 Session

## STATE OF TENNESSEE v. CHRISTOPHER LEON CLARK

**Appeal from the Criminal Court for Knox County**
**No. 115339    Steven Sword, Judge**

_____

### No. E2021-00558-CCA-R3-CD

_____

The Defendant, Christopher Leon Clark, was convicted by a Knox County Criminal Court jury of first degree premeditated murder, for which he is serving a life sentence. *See* T.C.A. § 39-13-202(a)(1) (2018) (subsequently amended). On appeal, the Defendant contends that (1) the trial court erred in denying his motion for a hearing to determine whether the State complied with an alleged duty to present exculpatory evidence to the grand jury, (2) the court erred in denying the Defendant's motion to suppress eyewitness identification testimony, and (3) cumulative error requires that he receive a new trial. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Gerald Gulley (on appeal and at hearing on motion for a new trial) and Adam Elrod (at trial), Knoxville, Tennessee, for the Appellant, Christopher Leon Clark.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez and Leslie Nassios, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

The Defendant's conviction relates to the April 20, 2017 killing of Walter Andrew Neal. In this appeal, the Defendant has raised issues related to two pretrial motions: (1) a motion for a pretrial hearing and ruling on whether the State complied with its "duty" to present exculpatory evidence to the grand jury and (2) a motion to suppress eyewitness identification evidence obtained during Lamar Denson's police interview. The trial court denied the motion related to the grand jury evidence on the basis that the State had no

obligation to present exculpatory evidence to the grand jury. The court denied the motion to suppress after a hearing.

Although the issues raised relate to the pretrial proceedings, a brief summary of the evidence presented at the trial is necessary to contextualize the issues. The trial evidence showed that the Defendant believed the victim had exhibited disrespect to the Defendant's girlfriend, Ashley Mills. The Defendant went to a basement apartment occupied by Alitha Flowers, Stephanie Ross, Lamar Denson, and the victim. The Defendant had been at a party at the house in which the apartment was located earlier in the evening. The Defendant knocked on the door and entered after the victim opened it. The Defendant confronted the victim about the perceived disrespect and, without allowing the victim to respond, pulled out a handgun and fired multiple shots, striking the victim three times and killing him. The victim was armed, but Ms. Flowers and Mr. Denson testified that the victim had not produced the gun when he was confronted by the Defendant. Ms. Flowers and Mr. Denson saw a gun on the floor after the victim was shot, and Mr. Denson thought the gun was the one the victim had possessed.

After the Defendant left the apartment, Mr. Denson threw the victim's gun in some bushes. When the police arrived, Mr. Denson told them that he did not know who shot the victim. While at the police station for questioning, Mr. Denson repeatedly told the police he did not know who shot the victim. Mr. Denson eventually told the police that the Defendant had been the shooter, and Mr. Denson identified the Defendant in a photograph lineup. Mr. Denson testified at the trial that he had known the Defendant for several years and that the Defendant had been the shooter.

Ms. Flowers initially denied to the police that she knew who the shooter had been, but she later identified the Defendant in a photograph lineup as the shooter. At the trial, she again identified the Defendant as the shooter. Ms. Ross also testified that the Defendant had been the shooter.

A police investigator testified that Ms. Ross had identified the Defendant as the shooter. The investigator said Ms. Ross had stated that both the Defendant and the victim had "both pull[ed] out guns" and that she ran outside. A forensic expert testified that four bullets or bullet fragments recovered from the scene had been fired from the same unknown weapon.

The Defendant did not present evidence.

After the jury returned its verdict and the trial court denied the motion for a new trial, the Defendant filed this appeal.

# I

## Denial of Motion Regarding the Evidence Presented to the Grand Jury

The Defendant contends that the trial court erred in denying his "Motion for a Pretrial Hearing and Ruling on Whether the State Has Complied with Its Duty to Present Exculpatory Evidence to the Grand Jury." He argues that he is entitled to a reversal of his conviction and a dismissal of the charge because the court erroneously held that the State had no federal or state constitutional duty to produce exculpatory evidence under its control to the grand jury.

In the Defendant's pretrial motion, he alleged that exculpatory evidence existed regarding the victim's possession of a weapon, the victim's arguing with the Defendant before the shooting, and the victim's reaching for his handgun before the shooting. The defense expressed its theory, based upon allegedly incomplete and misleading testimony from the preliminary hearing, that the State had not presented exculpatory evidence to the grand jury. The defense argued that the proper remedy for nondisclosure of exculpatory information to the grand jury was dismissal of the indictment, although it acknowledged that the trial court had ruled in another case that the State had no duty to disclose exculpatory information to the grand jury. The defense also requested in its motion that, should the court hold that no such duty existed, the court nevertheless make a factual finding regarding whether exculpatory information had been disclosed to the grand jury, and if no such disclosure had occurred, whether the nondisclosure "makes any difference under the facts of the present case."

The trial court conducted a hearing on the motion, at which the defense asked the court to hold that the due process protections of the Tennessee Constitution were more extensive than those in the United States Constitution and that the additional protections afforded a criminal defendant by the Tennessee Constitution required that a prosecutor disclose exculpatory evidence to the grand jury. The defense sought a hearing regarding "what happened at the grand jury" in order to determine whether information was disclosed that the victim had pulled his gun on the Defendant and that the victim had been seated but was moving to stand when the Defendant shot him.

At the hearing, the State called Lamar Denson, who testified about what he saw when the Defendant shot the victim, about his statement to the police after the shooting, and about his identification of the Defendant from a photograph lineup. Mr. Denson said he had not testified before the grand jury or at the preliminary hearing.

The State offered the transcript of the preliminary hearing as an exhibit, which the trial court said it would consider if it determined that the prosecutor had a duty to present exculpatory information to the grand jury.

The trial court denied the motion, holding that no state or federal constitutional right, nor any statutory right, compelled a State prosecutor to disclose exculpatory information to a grand jury. The court held that in the absence of a duty of the State to disclose exculpatory information to the grand jury, no further inquiry into the evidence actually presented to the grand jury was required.

The Defendant argues on appeal that his right to due process in accord with the Fifth and Fourteenth Amendments of the United States Constitution and article I, section 14 of the Tennessee Constitution compelled the State to disclose exculpatory information to the grand jury. He relies on *Shell v. State*, 893 S.W.2d 416, 422 (Tenn. 1995), a civil case in which the plaintiffs alleged negligent deprivation of a constitutional right through prosecutorial misconduct. The *Shell* plaintiffs raised four claims regarding the prosecutor's actions in the underlying criminal investigation and proceedings, one claim of which was that the prosecutor withheld exculpatory evidence from the grand jury. *Shell*, 893 S.W.2d at 418. Our supreme court recognized that the plaintiffs had alleged "several legally cognizable claims," which included "the prosecutor's dissemination of the names of the alleged victims to private attorneys, the improper interviewing techniques during the initial investigation, and the destruction of the tapes of the initial investigation." *Id.* at 422. Notably, the *Shell* court did not mention the fourth claim related to the lack of disclosure of exculpatory evidence to the grand jury. *See id.* In any event, our supreme court held that the *Shell* plaintiffs' action was barred by the statute of limitations. *See id.* at 423. Nevertheless, the Defendant argues on appeal that *Shell* "did not *exclude* other of the legally cognizable injuries alleged by the plaintiffs." (Emphasis in original.) We disagree. *Shell* did nothing to recognize any obligation upon a prosecutor to present exculpatory evidence to a grand jury and, in fact, its exclusion from the list of the plaintiffs' legally cognizable injuries suggests that no such obligation exists in order for the State to avoid civil liability, much less to invalidate a criminal indictment.

Our appellate courts have long declined to inquire into the sufficiency and legality of evidence presented to the grand jury. *See, e.g.*, *State v. Carruthers*, 35 S.W.3d 516, 532-33 (Tenn. 2000) (holding that the defendant's claim that a witness's grand jury testimony had been untrustworthy was not subject to judicial review); *Burton v. State*, 377 S.W.2d 900, 902-04 (Tenn. 1964); *State v. Dixon*, 880 S.W.3d 696, 700 (Tenn. Crim. App. 1992); *State v. Gonzales*, 35 S.W.2d 841, 845 (Tenn. Crim. App. 1982); *Parton v. State*, 455 S.W.2d 626, 633 (Tenn. Crim. App. 1970). Similarly, the United States Supreme Court has said that a federal prosecutor has no obligation pursuant to the Fifth Amendment to present exculpatory evidence to the grand jury. *See United States v. Williams*, 504 U.S. 36, 45-50 (1992); *cf. Costello v. United States*, 350 U.S. 359, 363 (1956) (declining to

recognize any Fifth Amendment right of inquiry into the competency and adequacy of the evidence presented to a grand jury).

The trial court did not err in holding that a prosecutor has no obligation to present exculpatory evidence to a grand jury. The Defendant is not entitled to relief on this basis.

## II

## Motion to Suppress

The Defendant contends that the trial court erred in denying his motion to suppress Mr. Denson's identification of the Defendant as the shooter. He argues that the identification procedure was marred by unduly suggestive or coercive techniques and that evidence of any in-court identification of the Defendant by Mr. Denson should have been suppressed. The State counters that the trial court did not err in denying the motion. We agree with the State.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). A trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

Suppression Hearing

At the suppression hearing, the defense offered a video recording of Mr. Denson's police interview, which was received as an exhibit. The recording reflected the following: Mr. Denson said he was in the kitchen when he heard shots. He did not know who shot the victim. One of the two officers told Mr. Denson that based upon other information they had, they did not think he was telling the truth. Mr. Denson began to reveal more information to the officers about the shooting and unlocked his cell phone upon their request. Mr. Denson acknowledged that the victim had a gun and that Mr. Denson had put it in the bushes on the side of the house. Mr. Denson thought the gun might have fallen

from the victim's waist when the victim was shot because Mr. Denson picked up the gun from the floor near the couch. Mr. Denson continued to insist that he did not know the shooter's name. One of the officers said that other witnesses were "saying otherwise" about the Defendant's having been the shooter despite Mr. Denson's having had "the closest view" of the shooting. The officer asked Mr. Denson, "What does that make you look like?" Mr. Denson said, "He's family, he's family," an apparent reference to the fact that the Defendant was the father of Mr. Denson's sister's child. One of the officers told Mr. Denson that the other witnesses had been forthcoming from the beginning but that Mr. Denson had not been forthcoming at first. The officer said that he and the other officer knew Mr. Denson "had a lot to gain, and had a lot to lose" and that Mr. Denson was "trying to weigh things out." The officer said that because Mr. Denson had a different account about who shot the victim, even though he had the best view of the shooting, it could appear as though Mr. Denson had "something to do with" the shooting. The officer told Mr. Denson that he was a witness but that if he were not forthcoming, he would become "sucked into all this other stuff." The officer also told Mr. Denson, "The truth will set you free." One of the officers showed Mr. Denson two photographs and asked if Mr. Denson knew who was depicted in them. Mr. Denson said he did not. The officer said, "That's not [the Defendant]?" and Mr. Denson said it was not. The officer asked if Mr. Denson had ever seen "that man before," and Mr. Denson said he had not. When asked if he had seen the man depicted in the photographs "tonight,"[1] Mr. Denson said he had not. After about forty minutes, the officers left the interview room, closing the door behind them. Mr. Denson remained seated in a chair and fell asleep intermittently. After about one hour and fifteen minutes, he answered a ringing cell phone on the table at which he was seated. He answered a second call a few minutes later. Both calls were brief. In the recording provided to this court, Mr. Denson's cell phone conversations were inaudible. About one hour and twenty-five minutes after the interviewing officers left the room, Mr. Denson knocked on the door, and a uniformed officer entered. Mr. Denson asked the officer how much longer he would need to stay, and the officer responded that he did not know, that the investigator left to do something, and that the officer would "try to find out something" for Mr. Denson. Mr. Denson said he was diabetic, and the officer asked if Mr. Denson needed a piece of candy or something else to eat. Mr. Denson responded, "Probably." The officer returned and left an item on the table, which Mr. Denson did not pick up. Several minutes later, an officer entered and said he had some "high energy chocolate." Mr. Denson asked how much longer he would have to stay. The officer said it would be "a while" and asked if Mr. Denson "saw the dead guy." Mr. Denson said he had. The officer told Mr. Denson he would "have to be inconvenienced for a while." The officer said he was leaving Sprite and crackers for Mr. Denson, who began eating. About five minutes later, two investigators entered the room. One asked if Mr. Denson was "alright" and if he had eaten some candy, and Mr. Denson said, "Yeah." Mr. Denson asked the time, and an

---

[1] According to the time and date stamp on the recording the interview took place on April 20, 2017, beginning at 5:23 a.m.

investigator responded by providing the time and saying they were "about to wrap this thing up." One of the investigators told Mr. Denson that he was about to show Mr. Denson a photograph lineup. The investigator told Mr. Denson not to feel pressure to pick out someone but to "do the right thing" if he recognized the person "responsible for tonight." Mr. Denson viewed the photographs, which were on a single page. He reached for the file folder underneath the page, and one of the investigators took the folder and covered it with papers and told Mr. Denson not to look at it. One of the investigators said they recognized that Mr. Denson was "between a rock and a hard place because of [his] sister," who was pregnant with the Defendant's child. The investigator said the victim was a friend and had done more for Mr. Denson than the Defendant ever had. When asked, "Who shot your friend?" Mr. Denson circled a person on the photograph lineup. When asked whom he had identified, Mr. Denson said, "Christopher," the Defendant's first name. The interview ended shortly thereafter.

Mr. Denson testified as a defense witness that he was questioned for about forty minutes and that he was left in an interview room, where he fell asleep. He said he knocked on the door when he woke but was not allowed to leave. He said he was diabetic and was hungry and thirsty during the interview. He said he felt weak and "had been there for so long" when he knocked on the door to leave. He said he wanted to know how much longer he would be there and whether he could have some food. He said he started feeling better after he was given food and drink. He said that when he was shown the photograph lineup, he had been given more than one sheet of paper but that he had not seen what was on the second page. Mr. Denson said he did not think the officers wanted him to lie in order to identify the Defendant as the shooter.

Mr. Denson testified that he was not "best of friends" with the Defendant but that he would not say he "hated" the Defendant. He said that he had not slept the night before the interview, that he had been confused and "sick" due to his diabetes, and that he had seen his nephew, who was his best friend, fatally shot. Mr. Denson said he had thought he had no way to leave the interview room without identifying the Defendant as the shooter.

Mr. Denson agreed that he spoke to the police voluntarily and that he had not wanted to tell them everything he knew. He said, however, that he tried to tell them the truth about how the shooting occurred, despite not wanting to identify the Defendant as the shooter. He acknowledged that he had held back information. He said that while he waited to talk to the police after the initial questioning, he spoke by telephone with his sister and that he realized after the conversation that he needed to tell the police everything he had seen. He said he had testified truthfully at a previous hearing about the Defendant's identity as the shooter and that he had not been forced or threatened into identifying the Defendant.

Knoxville Police Detective A.J. Loeffler testified that he was present when Detective Cook showed the photograph lineup to Mr. Denson. Detective Loeffler said the

second sheet of paper was "[m]ost likely . . . a copy of the same lineup." He said the typical procedure was to take two or three copies into an interview.

KPD Detective Cook testified that the page under the photograph lineup he showed to Mr. Denson was a second copy of the lineup, which was facedown. He said the typical practice was to print two copies before having a witness view a lineup.

In a written order denying the motion to suppress, the trial court found that, upon consideration of the totality of the circumstances, Mr. Denson was not coerced into identifying the Defendant. The court found, as well, that the photograph lineup procedure was not relevant to Mr. Denson's identification of the Defendant because Mr. Denson knew the Defendant. The court found that the relevant factual question was whether the Defendant was the person Mr. Denson saw shoot the victim, not whether Mr. Denson could see the person who shot the victim. The court stated:

> Mr. Denson made the identification of the defendant as the shooter freely and voluntarily. He attempted to protect the defendant at the beginning and changed his mind later on without undue pressure from the police. In other words, the procedures used by the police were not unnecessarily suggestive.
>
> . . . .
>
> [T]he court believes that Mr. Denson repeatedly said that the defendant was not the shooter because he was trying to protect the defendant who was the father of [Mr. Denson's] sister's baby, not because he didn't really know who did the shooting. The implication by the police that his dishonesty made him look like he might be involved does not appear to be the reason he eventually told the police that the defendant was the shooter. Even if it was the reason, the police conduct was not unfairly coercive. It very well may have been true. They made no threats or promises to the witness. Although the total time that the witness was in the interview room was over two hours, the total actual time of the interview was less than an hour. The police treated Mr. Denson with respect and were polite in their interactions with him. They sympathized with the difficult situation he was in. They gave him food and drink and he was able to sleep for some time.
>
> Under these circumstances, the court does not find the identification procedure was unduly suggestive or coercive. The court finds the identification to be sufficiently reliable to allow the State to seek an in-court identification of the shooter from Mr. Denson. The defendant may explore the tactics used by the police to impeach the credibility of the identification during the trial. However, the identification shall not be excluded.

Mr. Denson testified at the trial that the Defendant had fathered Mr. Denson's sister's child. Mr. Denson identified the Defendant in the courtroom. Mr. Denson said that on the date the victim was shot, Mr. Denson had known the Defendant for years and had "[s]omewhat" grown up with the Defendant. Mr. Denson said that he had lived with the Defendant, Ms. Mills, and Ms. Flowers for a couple of weeks before the shooting, but that he and Ms. Flowers had been asked to leave and that the victim had picked them up.

Mr. Denson testified about the events surrounding the shooting and identified the Defendant as the shooter. Mr. Denson acknowledged that he had told law enforcement at the scene that he had not seen and did not know the identity of the shooter. He said he had done so because he was in a difficult situation because his sister was going to deliver the baby within a week, but his best friend was dead. He said that after he thought about it, he knew he had to "do the right thing." He said he eventually identified the Defendant as the shooter. He identified the photograph lineup from which he previously identified the Defendant.

Mr. Denson agreed that his interview at the police station "lasted quite a long time" and that the investigators were "really pushing" him in the interview. He did not recall the investigators saying they knew the Defendant was the shooter and said, "They were just asking . . . who it was." He did not recall the investigators telling him that he could be charged as an accomplice if he did not "say something," but he recalled them telling him that he could spend a lot of money to defend himself. He acknowledged he had told the investigators he did not know the shooter's identity and that he also said, "If I knew for a fact, I could say, yeah, it was him, but it didn't look like him[.]" Mr. Denson agreed that he eventually identified the Defendant as the shooter "hours after" the interview began. He said he had not told the truth from the beginning "because of the family ties."

Ms. Ross testified that she had known the Defendant for several years. She identified the Defendant as the shooter.

Ms. Flowers testified that she had lived with the Defendant and Ms. Mills for a couple of weeks shortly before the date the victim was shot. She identified the Defendant as the shooter.

Analysis

The Defendant argues that Mr. Denson's initial identification of the Defendant as the shooter was obtained through police coercion and undue suggestion and that the trial court should have suppressed any in-court identification as tainted by the circumstances in

which the previous identification was made. The Defendant points to evidence that Mr. Denson gave contradictory statements about whether he saw who shot the victim and whether he knew who shot the victim, that the police told Mr. Denson he would be charged as an accomplice if he did not identify the Defendant as the shooter, that Mr. Denson had health issues during his lengthy questioning, that Mr. Denson was not allowed to leave the interview room after having fallen asleep and awakened, and that Mr. Denson believed he would not be able to leave the police station until he identified the Defendant as the shooter.

A witness's identification of a suspect "must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998). "It is the likelihood of misidentification that violates due process and renders [an] identification inadmissible." *State v. Philpott*, 882 S.W.2d 394, 400 (Tenn. Crim. App. 1994).

In determining whether an out-of-court identification is so impermissibly suggestive that it violates due process, trial courts should consider the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). The relevant factors include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200.

With regard to the use of photograph lineups, the Supreme Court has recognized that although perils exist in identifying suspects via this method, identification from photographs can be an effective method "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Simmons v. United States*, 390 U.S. 377, 384 (1968). As the *Simmons* court recognized, potential for misidentification increases when a photograph is "in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id*. at 383. The *Simmons* court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*. at 384; *see Sloan v. State*, 584 S.W.2d 461, 466 (Tenn. Crim. App. 1978). "[A] photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process

of law.'" *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)).

In determining whether evidence of an identification from a photograph lineup is admissible, the trial court must determine whether the identification procedure was unduly suggestive. *Biggers*, 409 U.S. at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998); *see Simmons*, 390 U.S. at 383. If the identification procedure was unduly suggestive, the second question is whether the identification was reliable despite the undue suggestion. *Biggers*, 409 U.S. at 198-99. If, upon consideration of the *Biggers* factors, the court determines that the identification procedure was so unduly suggestive that it violated the defendant's due process rights, evidence of the identification must be excluded. *State v. Shanklin*, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

To the extent that the Defendant argues that the police pressured Mr. Denson to make a statement naming the Defendant as the shooter and to identify the Defendant in the photograph lineup, Mr. Denson's testimony at the suppression hearing and at the trial belie the Defendant's claim. Mr. Denson knew the Defendant, having lived with him and having known him because the Defendant was the father of Mr. Denson's sister's child. Mr. Denson testified that he had been untruthful with the police initially because he was in a difficult position with his sister being in a relationship with the Defendant and with the Defendant's having just killed Mr. Denson's best friend. Mr. Denson did not want to become involved at first, but he eventually realized he had to "do the right thing" by being forthcoming about the Defendant's identity as the shooter. Significantly, Mr. Denson testified that he did not think the officers wanted him to lie or that he was uncertain in his identification but caved to pressure from the investigators to make an identification despite any uncertainty. Likewise, the record does not support a conclusion that the officers unduly suggested that the Defendant had been the shooter, either in the interview or in the composition and presentation of the photograph lineup. The record does not support a conclusion that the trial court erred in determining that the identification was not obtained through unduly suggestive means such that a substantial likelihood of misidentification existed.

The trial court did not err in denying the motion to suppress. The Defendant is not entitled to relief on this basis.

### III

### Cumulative Error

The Defendant contends that he is entitled to relief due to multiple errors in the proceedings below, the cumulative effect of which requires a new trial. The State counters that no error occurred. We agree with the State.

The cumulative error doctrine requires relief when "multiple errors [are] committed in the trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (internal citations omitted); *see State v. Jordan*, 325 S.W.3d 1, 79 (Tenn. 2010) ("'[T]he combination of multiple errors may necessitate . . . reversal . . . even if individual errors do not require relief.'") (quoting *State v. Cribbs*, 967 S.W.2d 773, 789 (Tenn. 1998)).

We have concluded that the State was not required to present exculpatory evidence to the grand jury and that the trial court did not err in denying the motion to suppress. Thus, multiple errors do not exist, and reversal due to the existence of cumulative error is not appropriate.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE